## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Mark Sullivan,

      Plaintiff,

      v.

The Ohio State University, *et al.*,

      Defendants.

Case No. 2:23-cv-3174

Judge Michael H. Watson

Magistrate Judge Jolson

### OPINION AND ORDER

American public universities have traditionally "prided themselves on being forums where controversial ideas are discussed and debated."  *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021).  Few universities have shown a stronger commitment to being such a forum than The Ohio State University ("OSU").  The crown jewel of OSU's commitment may well be a course titled "Crucial Conversations"—designed to train students how to communicate productively about difficult topics.

Yet a group of OSU officials (Defendants) terminated the lecturer who taught that course (Plaintiff Mark Sullivan) because of his controversial classroom speech, or so he alleges.  For considered pedagogical reasons germane to the course, Sullivan quoted the n-word.  After a student complaint launched an HR investigation, Defendants declined to renew Sullivan's employment contract.  Seeking reinstatement and damages, Sullivan brought a First Amendment retaliation claim, which Defendants now move to dismiss.

The First Amendment forbids public universities from dismissing lecturers because of controversial academic speech.  So, accepting Sullivan's allegations as true, for the reasons below, the Court **DENIES** Defendants' motion.

## I.      BACKGROUND

### A.    The Parties All Worked for OSU.

OSU is a public university in the University System of Ohio.  Compl. ¶ 3, ECF No. 50.

OSU's Max M. Fisher College of Business ("Business School") employed Sullivan from 2015 until 2022, most recently as a Senior Lecturer.  *Id.* ¶ 15.

During the 2021–22 academic year, OSU also employed all Defendants (in at least some capacity):

- Defendant Anil Makhija was the Dean of the Business School.  *Id.* ¶ 4.

- Defendant Robert Lount was the Chair of the Management and Human Resources Department at OSU.  *Id.* ¶ 5.  In that role, Lount directly supervised Sullivan.  *Id.*

- Defendant Bennett Tepper was the Senior Associate Dean for Faculty and Research at the Business School.  *Id.* ¶ 6.  In that role, Tepper supervised Sullivan's hiring.  *Id.*

- Defendant Jennifer McClendon was the Human Resources Business Partner of the Business School.  *Id.* ¶ 7.

- Defendant William Wattercutter was a Human Resources Consultant at the Business School.  *Id.* ¶ 8.

**B.     Sullivan Taught "Crucial Conversations," a Business School Course.**

The Business School offered a course titled "Crucial Conversations."

Compl. ¶ 21.  The course aimed to "accelerate personal growth and development

of MBA and Executive MBA students in being able to respectively engage in

prickly, toxic, and/or dysfunctional conversations in the spirit of building more

fruitful relationships in high-demand environments." *Id.* ¶ 24.  Through the

course, students developed "a capacity to constructively facilitate conversations

that include deeply sensitive or controversial issues in a skilled, well-practiced

manner." *Id.*  Sullivan's course achieved renown; students joined long waitlists

for the opportunity to enroll, and the course won awards.  *See id.* ¶ 20.

"Crucial Conversations" used a practical, action-based pedagogy.

Students begin by critiquing video vignettes of bullying and eventually escalate to

simulating difficult conversations themselves in one-on-one and group exercises.

*Id.* ¶ 25.  Some of these simulations involved mock conflict—complete with

intentionally triggering, provocative, disrespectful, or shocking language.  *See id.*

¶¶ 25–28.  Sullivan warned his students in advance that the exercises would

involve such language.  *Id.* ¶ 28.  The theory behind this pedagogy is that a

classroom role play provides a low-stakes environment ideal for honing

conversational skills.  *Id.*

One role play scenario cast Sullivan as Whitey Bulger (the late Boston-

based organized crime boss) and a student as a law enforcement officer trying to

obtain Bulger's cooperation.  *Id.* ¶ 28.  The purpose of this simulation was to

teach students how to engage with offensive language (Bulger's words as recited by Sullivan) while keeping the conversation on track to productive purposes (obtaining Bulger's cooperation). *Id.* ¶ 32. During the actual simulation, quoting a real statement Bulger made to law enforcement, Sullivan said,

> I don't want to be placed in a prison cell with a bunch of [n-word]s. You make sure I'm in a place with my kind and I'll talk about who was behind that job of killing [X].

*Id.* ¶ 30. Sullivan hoped for a student response such as,

> I understand you have strong feelings about the kind of cell mates you will be assigned to live with. We will want to listen more carefully to what matters to you as we also work with what is acceptable under prison rules and regulations.

*Id.* ¶ 31. Sullivan performed this simulation all 49 times he taught the course, without incident for the first 48. *Id.* ¶ 33.

Sullivan taught "Crucial Conversations" for the 49th time in the Fall 2021 semester. *Id.* ¶¶ 20, 33. After conducting the Whitey Bulger role play in September, a student in the course reported Sullivan for being racially insensitive and offensive. *Id.* ¶ 33. Defendant Lount informed Sullivan on September 30 that the Business School's HR Department required Lount to investigate Sullivan and his course. *Id.* ¶ 34.

**C.** **After Investigating, OSU Terminates Sullivan's Employment Contract; Sullivan Sues, and Defendants Move to Dismiss.**

Sullivan offers little detail about OSU's investigation of him. Sullivan pleads that all Defendants (along with other unknown individuals) participated in the investigation. *Id.* ¶ 35. On the substance of the investigation, Sullivan pleads

only one detail: a phone interview, during which Lount communicated that he understood Sullivan to be performing his duties responsibly.  *Id.* ¶ 34.  Despite this assurance, at some time unknown to Sullivan, Defendants (and other unknown individuals) deliberated and decided not to renew Sullivan's contract.  *Id.* ¶ 36.

Four months after Lount notified him of the investigation, Lount informed Sullivan that OSU would not renew Sullivan's employment contract.  *Id.* ¶ 37.  Sullivan believes Defendants terminated his employment because of his speech in Crucial Conversations.  *Id.* ¶ 38.

And so, Sullivan sued Defendants, alleging that they violated the First Amendment by terminating him.  Sullivan seeks monetary and equitable relief based on two causes of action (which the Court treats as one, as explained below): a "retaliation" claim and a "content & viewpoint discrimination" claim.  Both arise under the First Amendment and 42 U.S.C. § 1983.  Since first filing this suit, Sullivan has amended his Complaint a few times.  ECF Nos. 14, 36, 50.  He is on his Third Amended Complaint.  ECF No. 50.

Defendants move to dismiss Sullivan's Third Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  They raise three main arguments: (A) sovereign immunity bars monetary relief; (B) Sullivan's allegations fail to state a claim under the First Amendment and § 1983; and (C) qualified immunity bars individual-capacity claims against Defendants.  The Court discusses these three issues immediately below, in that order.

## II.   DISCUSSION

**A.   Sovereign Immunity Permits Sullivan's Individual-Capacity Claims For Damages And His Official-Capacity Claims for Reinstatement.**

Incident to their sovereignty, States are generally immune from suit under the Eleventh Amendment to the United States Constitution:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend XI.  Though the amendment's text mentions only suits by citizens of other States or countries, the amendment also prohibits suits against a State brought by its own citizens.  *Tennessee v. Lane*, 541 U.S. 509, 517 L.Ed.2d 820 (2004).  And though the amendment's text mentions only suits against States, the amendment also prohibits suits against "state officers acting in their official capacity" and "entities acting on behalf of the state."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

OSU, as a public university, is an "entity acting on behalf of the state" and thus qualifies for sovereign immunity.  *E.g.*, *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 653 (S.D. Ohio 2016) ("A suit against OSU is the same as a suit against Ohio").  The same goes for OSU officials—deans and the like—acting in their official capacity.  *See Sharma v. Ohio State Univ.*, 25 F. App'x 243, 248 (6th Cir. 2001).  Because Defendants here are OSU officials, the Eleventh Amendment covers them.  But its coverage is not absolute.

Under the *Ex Parte Young* exception, a plaintiff may sue a state actor in their official capacity, though only for certain kinds of relief. *See generally Ex parte Young*, 209 U.S. 123 (1908); *see also Edelman v. Jordan*, 415 U.S. 651, 665–66 (1974) ("We do not read Ex Parte Young . . . to indicate that any form of relief may be awarded against a state officer[.]").  Prospective relief is allowed; retrospective relief is not. *Edelman*, 415 U.S. at 677; *see also Diaz v. Michigan Dept. of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013).  Here, Sullivan seeks money damages—prototypical retrospective relief. *Ashford v. U. of Michigan*, 89 F.4th 960, 969 (6th Cir. 2024).  The Eleventh Amendment therefore bars Sullivan from suing Defendants in their official capacities for money damages.  Sullivan confesses as much.  Resp*. 2 n.1, ECF No. 57.

But this bar has little practical effect.

Sullivan sued Defendants not only in their official capacities but also in their individual capacities.  Compl. 1, ECF No. 50.  State officials sued in their individual capacities under § 1983 may be held liable for damages. *Hafer v. Melo*, 502 U.S. 21, 26 (1991); *see also Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001) (en banc) (permitting an individual capacity suit for damages). The Court may thus entertain Sullivan's individual-capacity claims for damages.

And Sullivan seeks not only monetary relief but also equitable relief. Compl. 13, ECF No. 50.  Specifically, Sullivan requests reinstatement. *Id.* "'[C]laims for reinstatement are prospective in nature and appropriate subjects for *Ex parte Young* actions,'" per established Sixth Circuit precedent. *Josephson v.*

*Ganzel*, 115 F.4th 771, 782 (6th Cir. 2024) (quoting *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002)). The Court may thus also entertain Sullivan's official-capacity claims for reinstatement.

In sum, then, the Court accepts Defendants' sovereign immunity argument for what it is worth: Sullivan cannot seek damages on his official-capacity claims. But Sullivan may still seek damages (albeit on his individual-capacity claims only) and pursue his official-capacity claims (albeit for reinstatement and other prospective equitable relief only). Having concluded that sovereign immunity allows the Court to entertain all Sullivan's claims if they have merit, the Court now proceeds to analyze whether they might, in fact, have merit.

**B.      Sullivan Pleads Factual Allegations Sufficient To State a Prima Facie Case for First Amendment Retaliation.**

A claim survives a motion to dismiss under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Twombly*, 550 U.S. at 556. A pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint

are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). At the motion-to-dismiss stage, a district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wamer v. Univ. Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (internal quotation marks and citations omitted). But the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Sullivan brings a First Amendment retaliation claim.[1] To prove a First Amendment retaliation claim, Sullivan must show: (1) he engaged in protected speech; (2) Defendants took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action. *Josephson v. Ganzel*, 115 F.4th 771 (6th Cir. 2024) (citing *Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024)). The Court examines these three elements in turn.

---

[1] Sullivan insists that he brings two claims (a retaliation claim and a standalone content and viewpoint discrimination claim), but the Court continues to treat them as one retaliation claim. The Court remains unaware of any good authority recognizing a standalone claim for content and viewpoint discrimination based on the dismissal of a public employee. All cases (including those Sullivan cites) seem to evaluate such dismissals under the tried-and-true First Amendment retaliation framework. *See, e.g.*, *Hartop*, 992 F.3d at 509. And treating retaliation as separate from discrimination in this context makes little sense. Retaliation and discrimination are two names for the same concept here: both involve taking an adverse action against a public employee because of the content or viewpoint embodied in their speech.

**1.    The First Amendment protects Sullivan's classroom speech.**

Courts assess whether a public employee's speech is protected by the First Amendment under the *Pickering-Connick* framework.[2]  *Hartop*, 992 F.3d at 509 (collecting cases); *see generally Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).  Applying that framework, the Court asks two questions: First, was Sullivan speaking on "a matter of public concern"?  *Connick*, 461 U.S at 146.  And second, was his interest in doing so greater than OSU's interest in "promoting the efficiency of the public services it performs"?  *Pickering*, 391 U.S. at 568.

**a.    Sullivan alleges speech on "matters of public concern": race and the n-word's (arguable) pedagogical value.**

Speech is on a "matter of public concern" if it is "controversial," "sensitive," or "of profound value."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) (cleaned up).  Examples include climate change, race, gender, and religion.  *Id.* (citations omitted).  Classroom instruction generally implicates a matter of public concern "because the essence of a teacher's role is to prepare students for their place in society as responsible citizens."  *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001).  But

---

[2] Normally, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  But that rule does not apply to "professors at public universities . . . engaged in core academic functions, such as teaching and scholarship."  *Hartop*, 992 F.3d at 505.  They receive the *Pickering-Connick* framework minus *Garcetti*.  *Id.* at 509.

the Sixth Circuit has found classroom speech to fall outside the public concern before. *Bonnell v. Lorenzo*, 241 F.3d 800, 820–21 (6th Cir. 2001) (professor's gratuitous use of vulgarities not protected even though made during class). The linchpin of the analysis is purpose: speech is protected if the "point" goes to a matter of public concern but unprotected if that matter is only "incidental" to the point. *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1185–88 (6th Cir. 1995). To determine the purpose, courts look to content, form, and context. *Connick*, 461 U.S. at 147–48.

Sullivan's purpose in uttering the n-word, as Defendants see it, was merely to upset students—not to make some philosophical point. Mot. 9–10, ECF No. 53. And, Defendants continue, to the extent that Sullivan did advance a philosophical point, that point was incidental to his primary purpose of triggering students. *Id.*

Defendants anchor this argument by analogizing to *Dambrot*. Mot. 9–10, ECF No. 53. In that case, a public university fired its head men's basketball coach after he used the n-word during a locker room speech. *Dambrot*, 55 F.3d at 1180. The Sixth Circuit held that the coach's speech was unprotected because it did not touch a matter of public concern. *Id.* at 1185–86. Acknowledging that the coach's speech was controversial, the court reasoned that the "*point*" of the coach's speech was to motivate. *Id.* at 1187 (emphasis in original). This parallels the "point" Defendants attribute to Sullivan here: to trigger. And just as using the n-word was "incidental" to motivating basketball

Case No. 2:23-cv-3174                                                    Page 11 of 27

players in *Dambrot*, it is "incidental" to triggering Business School students here, Defendants argue. Mot. 10, ECF No. 53. Because the coach's base purpose removed his speech from public concern in *Dambrot*, Defendants submit that Sullivan's equivalently base purpose does the same here. *Id.*

But Defendants mischaracterize Sullivan's "purpose" in uttering the n-word. Sullivan's purpose, as alleged, was not *just* to trigger his students. He triggered them for a separate, ultimate purpose: teaching them to converse productively *despite* having been triggered. The context—the general mission of the course—renders that purpose plausible. Plus, if Sullivan's purpose was just to trigger, he likely would not issue a warning, which he alleges he did, to "lower the shock level in early attempts to engage with disrespectful roleplay provocateurs." Compl. ¶ 27. Granted, the coach in *Dambrot* also triggered his players for a separate, ultimate purpose: winning a basketball game. But (if not already obvious), the coach's purpose is categorically different from Sullivan's. The Court does not mean to belittle basketball, but preparing students to handle controversial language strikes much closer to the heart of "public concern."

The Sixth Circuit confirmed this intuition in *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671 (6th Cir. 2001). In that case, the Sixth Circuit held that a professor's use of the n-word implicated matters of "overwhelming" public concern. *Id.* at 679. *Hardy* involved a community college that declined to renew an adjunct professor's contract after he said the n-word (among other offensive words), prompting a student complaint. *Id.* at 674–75. The adjunct uttered the

offensive words during an in-class lecture on language and social constructivism,[3] part of a course called "Introduction to Interpersonal Communication." *Id*. The lecture examined how language (like the n-word) can marginalize and oppress. *Id*. The "academic context" of the adjunct's use of the n-word distinguished it from the coach's in *Dambrot*. *Id*. at 679.

The "academic context" here is materially on all fours with that in *Hardy*. As was true for the adjunct, Sullivan's in-class use of the n-word was allegedly germane to an academic purpose. The lessons were not identical, of course. The adjunct's lecture abstractly reflected on racially charged language, whereas Sullivan's exercise pragmatically trained students how to respond to it. But, at bottom, both the *Hardy* lecture and the Sullivan exercise relate to race and power conflicts in society—matters of overwhelming public concern. By force of *Hardy*, Sullivan's in-class utterance of the n-word likely implicates race relations—a quintessential matter of public concern.

Beyond just race in general, Sullivan's speech, as alleged, also addresses the specific matter of whether using the n-word in class can have worthwhile pedagogical value. This matter is undeniably one of public concern. *Cf. Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 230–31 (6th Cir. 2005) (holding that teaching *To Kill a Mockingbird* implicates a

---

[3] *See generally* Paul Baghossian, *What is Social Constructivism?* (undated, unpublished manuscript), available at <https://paulboghossian.com/docs/Boghossian-Paul-socialconstruction1.pdf>; Ron Mallon, *Naturalistic Approaches to Social Construction*, The Stanford Encyclopedia of Philosophy (June 5, 2024).

matter of public concern). This debate entered the zeitgeist most prominently as grade schools considered banning classic books that contain the n-word.[4] On one side of this debate are those who believe that educators should never use the word because it is so hateful, degrading, and traumatizing that any pedagogical value it might have could never outweigh the pain or distraction it causes.[5] On the other side are those who believe the opposite: uttering slurs can be "sound pedagogy—not just something [educators] have a right to do, but itself the right thing to do"—because the n-word prompts reflection on American history, quoting it may be necessary for precision, and hearing it in the classroom prepares students to hear it in the "real world."[6] Not only did Sullivan implicitly take a side in this debate by uttering the n-word in his classroom, *see Hartop*, 992 F.3d at 508 ("[H]is mode of address *was* the message." (emphasis in original)), but his whole "Crucial Conversations" course was allegedly a monument to the view that hearing charged language in a classroom is pedagogically worth it. The Court need not take a position on this debate over

---

[4] *See id.*; Samantha Lock, *'To Kill a Mockingbird,' Other Books Banned From California Schools Over Racism Concerns*, Newsweek (February 1, 2021); *see also* Madeline Will, *Despite 'Discomfort,' Many Teachers Still Teach 'To Kill a Mockingbird.' Here's Why*, Edu. Week (October 17, 2017); Michiko Takutani, *Light Out, Huck, They Still Want to Sivilize You*, N.Y. Times (January 6, 2011).
[5] *See, e.g.*, *Statement*, 54 UC Davis L. Rev. 2301, 2301 (2021) ("The N word is rooted in degradation, dehumanization, and anti-Black racism, and has no place in academia . . . . [N]ormalizing the use of racial epithets detracts from any sort of educational value or productive discourse[.]");Tyrone C. Howard, *It's Time to Completely Ban the N-Word in Schools*, Edu. Week (October 28, 2019).
[6] Randall Kennedy & Eugene Volokh, *The New Taboo: Quoting Epithets in the Classroom and Beyond*, 49 Cap. U.L. Rev. 1, 11 (2021).

the pedagogical worth of the n-word; it is sufficient to conclude that Sullivan's speech did and therefore involved another matter of public concern.

In sum, as alleged in the Third Amended Complaint, Sullivan's use of the n-word during an in-class exercise relates to both race generally and the n-word's pedagogical value specifically. For those reasons, the Court holds that Sullivan's speech is likely on a matter of public concern and deserves First Amendment protection, satisfying the *Connick* half of the *Pickering-Connick* framework. The Court turns now to the *Pickering* half of the framework.

### b. Sullivan's interest in "academic freedom" outweighs OSU's and so passes the *Pickering* balancing test.

Under *Pickering*, the Court applies a balancing test, which weighs "the interests of the [professor], as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. Here, that balance favors Sullivan.

On Sullivan's half of the scale, the Court finds "the robust tradition of academic freedom in our nation's post-secondary schools." *Hardy*, 260 F.3d at 680. As the United States Supreme Court once remarked:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.

Case No. 2:23-cv-3174                                    Page 15 of 27

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our society will stagnate and die."); *Adler v. Bd. of Educ. of City of New York*, 342 U.S. 485, 508–11 (1952) (Douglas, J., dissenting) ("The public school is in most respects the cradle of our democracy."). This tradition of academic freedom places a heavy weight on Sullivan's half of the *Pickering* scale. *See Hartop*, 992 F.3d at 509.

By comparison, the interests on OSU's half of the scale are scant. Defendants assert that Sullivan's use of the n-word during class was so disruptive that it impeded OSU's ability to fulfill its responsibilities. Mot. 10 n.2, ECF No. 53. As evidence of this disruption, Defendants cite the student complaint that prompted (some of) them to investigate. *Id.*

Disruption may not even deserve a place on Defendants' side of the *Pickering* scale. *See Hardy*, 260 F.3d at 682 (citing *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 508–09 (1969)). After all,

> undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression . . . . Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans.

*Tinker*, 393 U.S. at 508–09.

But even if disruption does belong on the *Pickering* scale, here it does not cause the scale to budge. The disruption caused by the n-word (and other slurs) in *Hardy* did not tilt the *Pickering* scale in the community college's favor. *Hardy*, 260 F.3d at 681. There, as here, only one student complained about only one lecture. *Id.* In fact, *Hardy*'s reasoning applies with even more force here. The educator in *Hardy* uttered many slurs; Sullivan uttered only one. And not only did Sullivan allegedly teach the rest of the semester without any complaints, but he also taught the same material 48 times previously without any student complaints.

What is more, Sullivan says that each time he taught the course, OSU approved. "[P]rior approval of controversial speech by the school or the Board undercuts the interests of the state in controlling the workplace." *Evans-Marshall*, 428 F.3d at 231; *see also Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1054–55 (6th Cir. 2001) ("[W]e cannot allow [concerns of harmony, efficiency, and discipline] to tilt the *Pickering* scale in favor of the government . . . when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech."). If Sullivan uttering the n-word during a Whitey Bulger role play was so disruptive, why would OSU and Defendants allow him to do it 48 times previously?

All in all, taking his allegations as true, Sullivan's dismissal smacks of the "pall of orthodoxy" and "undifferentiated fear of disturbance." So, weighing

Sullivan's interest in academic freedom against OSU's professed interest in avoiding disruption, the Court holds that Sullivan's claim likely survives *Pickering* balancing.

The Court thus concludes that the *Pickering-Connick* framework supports Sullivan's claim. The Court proceeds to the other elements of First Amendment retaliation, starting with adverse action.

### 2. Sullivan alleges that each Defendant participated in terminating his contract, satisfying the "adverse action" element.

An adverse action in the First Amendment retaliation context is an action that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (internal quotations omitted). Declining to renew a university lecturer's contract, which Sullivan alleges here, Compl. ¶ 37, ECF No. 50, is "a traditional example of an adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 787 (6th Cir. 2024).

But that is not enough, Defendants correctly point out. Sullivan must also allege "how each defendant 'directly participated in the [adverse action], at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself.'" *Gardner v. Evans*, 920 F.3d 1038, 1051 (6th Cir. 2019) (quoting *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013)). Sullivan has not done so, say Defendants. The Court disagrees.

Sullivan sufficiently alleges each Defendant's role in his termination. *Cf. Rideout v. Shelby Twp.*, 691 F. Supp. 3d 816, 825–26 (E.D. Mich. 2023).

- Sullivan alleges that Lount interviewed him as part of the investigation, deliberated with (at least) Tepper and HR, approved Sullivan's termination, and informed Sullivan of the non-renewal decision. Compl. ¶¶ 5, 34–37, ECF No. 50.

- Sullivan alleges that Tepper also attended the deliberations and approved Sullivan's termination (as the Dean of faculty and Sullivan's hiring supervisor). *Id.* ¶¶ 6, 35, 36, 38.

- Sullivan alleges that McClendon and Wattercutter participated in the terminations (as HR supervisors). *Id.* ¶¶ 7, 8; *see also id.* ¶¶ 35, 36.

- Sullivan alleges that Makhija approved Sullivan's termination (as Dean of the Business School). *Id.* ¶ 4; *see also id.* ¶¶ 35, 36.

"While [Sullivan] will need to substantiate these allegations to survive a motion for summary judgment," the Court finds that he has "sufficiently alleged conduct by each [Defendant] to survive a motion to dismiss." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 901 (6th Cir. 2019).

The Court moves on to the final element of First Amendment retaliation: the reason for the adverse action.

### 3. Sullivan alleges sufficient circumstantial evidence to support the inference that Defendants fired him because of his speech.

To state a First Amendment retaliation claim, Sullivan must plead facts sufficient to show that Defendants terminated him "motivated at least in part" by his protected classroom speech. *Ganzel,* 115 F.4th at 787. Sullivan may make this showing with circumstantial evidence. *Dye v. Off. of the Racing Commn.,* 702 F.3d 286, 305 (6th Cir. 2012). No fewer than three clusters of circumstantial evidence support Sullivan's showing.

First, Defendants investigated Sullivan and his protected classroom speech based on a student complaint. Compl. ¶¶ 33–35. The Sixth Circuit has sustained at least one First Amendment retaliation claim based on a similar investigation. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d at 1056; *cf. Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009). In *Cockrel,* a school district fired a fifth-grade teacher after she invited Woody Harrelson to her classroom to give a presentation on the environmental benefits of industrial hemp. *Id.* at 1041–42. Influenced by parent complaints, the principal and school district superintendent launched an investigation and unscheduled evaluation visits. Based on this chain of events, the Sixth Circuit found that the plaintiff in *Cockrel* established the causation element.

This Court sees an analogous speech-complaint-investigation-termination chain here. One of Sullivan's students complained about Sullivan's in-class speech, just as parents complained of Woody Harrelson's presentation in *Cockrel*. In both cases, the complaints prompted investigations about the protected activity. And in both cases, shortly after the investigation, the educator was terminated. Applying *Cockrel*'s reasoning here, the Court finds that the sequence of events leading to Sullivan's termination grounds the inference that his speech motivated his termination.

Second, this sequence all happened within five months. Temporal proximity between the protected conduct and the adverse action is paradigmatic circumstantial evidence in the retaliation context and may alone suffice to show a

causal connection. *See, e.g.*, *Dye*, 702 F.3d at 305 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–25 (6th Cir. 2008)). There are, however, no bright-line rules about how much time is sufficient (or deficient). *See Gambill v. Duke Energy Corp.*, 456 Fed. App'x. 578, 589 (6th Cir. 2012) (collecting cases). Rather, the Court must analyze the timing in context to assess whether it permits an inference about the employer's motivation.

The Court finds that the timing here bolsters the causal inference. The Court returns to *Cockrel* because the school district there ran on the two-semester "school year" as OSU does here. In *Cockrel*, Woody Harrelson made his presentation on the last day of school (May 30, 1995), and the school district fired the teacher who invited him weeks after the next school year ended (July 15, 1997). .*Cockrel*, 270 F.3d at 1041–45. Sullivan said the n-word during a lecture in September 2021, and Defendant Lount informed him in late February 2022 that his contract would not be renewed. The time gap between protected conduct and firing was thus longer in *Cockrel* than it is here.[7] Yet the *Cockrel* panel held that temporal proximity helped establish the causation element there. *Id.* at 1056. This Court therefore holds the same.

---

[7] In *Cockrel*, Mr. Harrelson gave the same hemp presentation a second time in January 1997. 270 F.3d at 1043–44. If the Court were instead to use that date as the date of the protected conduct, the gap between protected conduct and adverse action there would still be comparable to the gap here. Both would be about five months (or about two months after the semester with the complained-of conduct).

Third, Defendant Tepper's remarks during his exit interview also hint at a causal connection. Post-termination remarks like these may indeed support a causal inference. *See Ganzel*, 115 F.4th at 788. Sullivan alleges that Tepper said that "Lount did not know what he was doing regarding addressing the issue in a constructive and successful manner" and that "Lount just fell apart and let HR take over and do whatever they wanted to do." Compl. ¶ 38, ECF No. 50. Sullivan glosses these remarks as a quasi-confession that Defendants' non-renewal decision was motivated by his uttering the n-word. Resp. 12, ECF No. 57. Tepper's alleged references to "the issue" and "HR" (who was investigating Sullivan for his classroom speech) make this gloss plausible. Accepting this plausible gloss as true, it reinforces Sullivan's allegations on the causation element.

These three factors lead the Court to hold that Sullivan has pleaded sufficient facts to meet the causation element: they support an inference that Defendants terminated Sullivan in retaliation for his in-class speech.

In toto, Sullivan's Complaint alleges facts that, if proven, would meet all three elements of First Amendment retaliation. The Court thus concludes that Sullivan has stated a First Amendment retaliation claim. Defendants, however, have one final card to play: qualified immunity.

**C.    Qualified Immunity Does Not Warrant Dismissal of Sullivan's Individual Capacity Claims at this Stage of the Litigation.**

On top of sovereign immunity and the First Amendment merits, Defendants invoke another immunity doctrine: qualified immunity.  Mot. 12–14, ECF No. 53. Under that doctrine, public officials performing discretionary functions are immune to § 1983 individual-capacity suits[8] unless they violated a "clearly established" statutory or constitutional right.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To survive the motion to dismiss based on qualified immunity, then, Sullivan must allege facts that, if true, would show (1) Defendants violated (2) his clearly established constitutional right.  *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562–63 (6th Cir. 2011).  That said, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity."  *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal citations omitted).  Mindful of that admonition, the Court finds that Sullivan has adequately pleaded both elements necessary to survive a motion to dismiss based on qualified immunity.

---

[8] But qualified immunity does not protect defendants from official capacity suits.  So Sullivan's official capacity claims for equitable relief (*e.g.*, reinstatement) would withstand even qualified immunity.

1. **Sullivan plausibly alleges that Defendants violated his rights (as the Court held above).[9]**

The Court essentially analyzed this element already[10] and concluded that Sullivan plausibly alleged a First Amendment retaliation claim for all Defendants. Fortifying that conclusion, the Sixth Circuit's anti-QI-motion-to-dismiss admonition applies with extra force here to the constitutional violation element. *See Evans-Marshall*, 428 F.3d at 234 (Sutton, J., concurring) ("In the absence of discovery concerning why the teacher spoke and why the school [] restricted her speech, it is difficult to understand how a court has any choice but to deny a motion to dismiss premised on the contention that no constitutional violation occurred.").

2. **Sullivan's right to free speech in the classroom is "clearly established."[11]**

Of course, that the "First Amendment bars retaliation for protected speech" is clearly established. But the right at issue "should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation marks omitted). Rather, in retaliation cases, courts adopt the plaintiff's speech as the unit of analysis and ask whether that speech is protected under clearly established law.

---

[9] The Court's conclusion on this element is not, however, the law of the case. *See Buddenberg v. Est. of Weisdack*, 711 F. Supp. 3d 712, 771 (N.D. Ohio 2024). This Court may reconsider this element of qualified immunity at summary judgment, when it has the benefit of full discovery. *Id.*

[10] S*ee, supra,* Part. II.B.

[11] The Court may revisit this issue at summary judgment, for the same essential reason that it may revisit the violation element. *See Evans-Marshall*, 428 F.3d at 235 (Sutton, J., concurring) ("Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" (cleaned up)).

*See, e.g.*, *McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 696 (2024). For protection to be clearly established, there need not be an earlier decision "directly on point," but there does need to be then-existing precedent placing the issue "beyond debate." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal citations omitted).

Sullivan's First Amendment right to utter the n-word for educational purposes was "beyond debate" when he was terminated, per then-existing U.S. Supreme Court and Sixth Circuit precedent.

A long line of U.S. Supreme Court precedent establishes a First Amendment right to free speech in academic contexts, especially the classroom. *Sweezy*, 354 U.S. at 249–50 (holding that it "could not seriously be debated" that professors have a "right to lecture"); *Keyishian*, 385 U.S. at 603 ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."); *see also Adler*, 342 U.S. an 508–11 (Douglas, J., dissenting) ("The Constitution guarantees freedom of thought and expression to everyone in our society. All are entitled to it; and none needs it more than the teacher."); *cf. Tinker*, 393 U.S. at 506 ("First Amendment rights . . . are available to teachers[.]"); *Healy v. James*, 408 U.S. 169, 180–81 (1972) ("[W]e break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom."); *see generally* Keith E. Whittington, *Professorial Speech, the First Amendment, and Legislative Restrictions on Classroom Discussions*, 58 Wake Forest L. Rev. 463, 482–92 (2023).

Although the Supreme Court held, in *Garcetti*, that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline[,]" 547 U.S. at 421, it expressly declined to address whether that rule would apply "to a case involving speech related to scholarship or teaching." *Id.* at 425.

The Sixth Circuit, in *Hartop*, walked through the door that *Garcetti* left open. 992 F.3d at 504–05. *Hartop* distilled the principle, from Supreme Court and Sixth Circuit precedent, that "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching." *Id.* The Sixth Circuit has since held that this principle was clearly established as of 2017. *See Ganzel*, 115 F.4th at 790. Thus, whether the First Amendment protected Sullivan's alleged speech in 2021 is "beyond debate."

But even if this principle were too general to shed qualified immunity, the Sixth Circuit in *Hardy* held specifically that when a professor utters slurs like the n-word for an educational purpose (as Sullivan allegedly has here) that speech is protected. *Hardy*, 260 F.3d at 680. *Hardy* has been good law since it was decided (*Garcetti*'s express carve-out for classroom speech left *Hardy* intact), but *Hartop* reaffirmed it, in any event. *Hartop*, 992 F.3d at 505 (citing *Hardy*, 260 F.3d at 680); *see also id.* (citing *Bonnell v. Lorenzo*, 241 F.3d at 823 ("[A] professor's rights to academic freedom and freedom of expression are

paramount in the academic setting.")). All told, *Hardy* places Sullivan's at-issue rights even further beyond debate.

Thus, Sullivan's First Amendment right to quote the n-word as part of an in-class exercise is "clearly established." Finding Sullivan to have adequately alleged a violation of clearly established law, the Court holds that Defendants are not entitled to qualified immunity (at this stage of the litigation, at least).

## III.    CONCLUSION

Having rejected all three arguments Defendants raise (sovereign immunity, insufficient factual pleadings, and qualified immunity), the Court **DENIES** their Motion to Dismiss.

The Clerk shall terminate ECF No. 53.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**